## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTIRCT OF ILLINOIS

| | | |
|---|---|---|
| **JOHN ROE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 21-cv-125** |
| | ) | |
| **REGINA LOMBARDO, in her official** | ) | |
| **capacity as acting director of the Bureau of** | ) | |
| **Alcohol, Tobacco, Firearms and Explosives,** | ) | |
| **and JEFFREY ROSEN, in his official** | ) | |
| **capacity as acting attorney general,** | ) | |
| | ) | |
| **Defendants.** | ) | |

Comes now Plaintiff John Roe, by and through his attorneys, Thomas G. Maag and the

Maag Law Firm, LLC, and for his cause of action, states as follows:

### PARTIES

1. At all times relevant, Plaintiff John Roe ("Roe") is a natural born citizen and resident of

   Illinois, and has been since well prior to 1979. Roe is not Plaintiff's true name, but rather

   is a pseudonym used to protect Plaintiff's actual identity, in accordance with his 5th

   Amendment rights against self-incrimination, as he actually fears criminal prosecution,

   due to his possession of the subject of this lawsuit, and his desire and intent to transfer

   same to another person. By keeping his name as a pseudonym, he is able to vindicate his

   rights and/or clarify the law and the responsibilities of himself and defendants, without

   fear of criminal arrest, prosecution and/or jail, thus guiding Plaintiff's future conduct to

   be in accordance with the law[1], and Defendants' future conduct to be in accordance with

   the law.

---

[1] That Plaintiff is willing to provide his name if he is provided with immunity, in connection with
the issue of this lawsuit. However, in the absence of such protections, Plaintiff is invoking his

2.  That Defendant Regina Lombardo, sued in his official capacity, is the Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), which, during the relevant time period, and since 1972, was and is a Bureau, now within the U.S. Department of Justice ("DOJ"), and, previously was known as the Bureau of Alcohol, Tobacco and Firearms, and previously was a bureau within the Department of the Treasury, and prior to 1972 was a unit within the Internal Revenue Service, known as the Alcohol and Tobacco Tax Unit.  That ATF is the federal bureau primarily responsible for administering and enforcing federal firearms laws, and is the current custodian of the national registry of firearms regulated under the National Firearms Act of 1968, known as the National Firearms Registration and Transfer Record, such that a ruling in favor of Plaintiff and against ATF will provide actual relief to Plaintiff, and bind both relevant parties.

3.  In addition, Defendant Jeffrey Rosen, sued in his official capacity, is the Acting Attorney General of the United States, and as such, is the ultimate head of the Department of Justice, the Department of which the ATF is presently a bureau within, and the person with ultimate authority, under the National Firearms Act of 1968, to implement a registration period, for up to 90 days, when published in the federal register, as presently stated in Section 207(d) of the Gun Control Act of 1968, Public Law 90-618, approved October 22, 1968.

**FACTS**

---

rights, under the Fifth Amendment, to the U.S. Constitution, to keep his identity confidential at this time, in order to avoid the real and substantial risk of criminal prosecution, should Plaintiff prove unsuccessful in his or her asserted claims.

4. In or about 1979, plaintiff lawfully acquired, inside the State of Illinois, one or more items known as a drop in auto sear ("DIAS"), near Mount Vernon, Illinois, in the Southern District of Illinois

5. That DIAS also known as a "auto sear" or "auto sear 2", is an aftermarket part, invented in the mid-1970s, that would, in addition to certain other parts which have never been in Plaintiff's possession, make some, but not all, otherwise semi-automatic AR15 rifles fire more than one shot but a single function of a trigger, in other words, fire as a 'machinegun" as that term was defined in 28 U.S.C. 5845(b), in both 1981 and under current law, without modifying the semi-automatic receiver into being a machinegun receiver.[2]  See ATF Ruling 81-4, attached hereto as exhibits as included in several official ATF publications printed and distributed for purposes of guiding the firearm industry and the general public.

6. That prior to 1981, several thousands of these auto sears were manufactured and sold in the United States generally, and in the Southern District of Illinois, specifically, without any kind of federal control.  They were literally treated as unregulated parts, the same as, for instance, pins, screws and springs.

7. That in 1981, in ATF ruling 81-4, the ATF reclassified the DIAS from being unregulated, in and of itself, to being a machinegun, as regulated by the National Firearm Act of 1968, but specifically exempting and grandfathering those DIAS made prior to the effective date of ATF Ruling 81-4, and expressly allowing for said pre-81 DIAS to be possessed

---

[2] The definition was amended in 1986 to include any part designed and intended solely and exclusively for use in converting a weapon into a machinegun, which prior to 1986 was not included in the definition of "machinegun".  It appears that this 1986 language was designed expressly to bring into the ambit of the machinegun definition items like the DIAS at issue in this case.

and transferred without registration and/or payment of tax, as required by the National

Firearms Act, and many persons continued to market said pre-81 DIAS, publicly, and

with knowledge of the ATF, for years afterward.  For instance, well into the 2000s, sale

of said pre-81 DIAS were publicly advertised for sale in mainstream firearms

publications, like the Shotgun News, n/k/a Firearm News, and in the similar publication,

Armslist, pre-81 DIAS for around $100.00, for sale to anyone, via mail order, as an

unregulated part.

8. Shortly thereafter, ATF also reclassified certain pistols as "machineguns" under the NFA

(See ATF Rulings 82-2 and 82-8), but likewise grandfathered the possession and transfer

of these "pistols" manufactured prior to the date of these rulings, using the exact same

language as ATF did in ruling 81-4.  These grandfathered pistols remain available on the

legitimate open market, generally sold at a premium price for their novelty, and with no

known cases where ATF, or any other part of the United States has seized or alleged

these pistols, when not possessed by a prohibited person, were unlawful or contraband.

9. An unknown number of similar DIAS were made and sold in the Southern District of

Illinois, including those at issue in this case.

10. That Plaintiff, while buying lumber for a job, at a lumber yard, near Mount Vernon,

Illinois, in about, and no later than, 1979, noticed a display of firearms for sale at the

premises.

11. That, on display, in the glass case, were several DIASs shown for sale, publicly and in the

open for any customer at the lumber yard to see and potentially purchase.

12. That Plaintiff was advised by the owner, the items were called auto sears, that he (the

owner) had made the items, and that, upon the paying of a tax to the ATF, could be used

to make an AR15 type semi automatic rifle into a legal machinegun, but that the DIAS themselves, without other M16 machinegun parts were unregulated parts, and legal to possess by themselves.

13. That Plaintiff thereafter purchased and paid for one or more of these DIAS.

14. Shortly, and within two weeks, after purchasing the DIAS, being aware that machineguns were regulated items, and wishing to insure his compliance will all applicable laws, Plaintiff contacted both the Illinois State Police and the ATF, at their local offices, then located in the Southern District of Illinois, by phone, and inquired as to the legality of the DIAS, to insure what he was told by the seller was correct, and that the possession of the DIAS was lawful.

15. The Illinois State Police advised Plaintiff that they had never heard of such a device, were unaware of any law against the DIAS, but suggested calling the ATF.

16. The ATF, after forwarding the call to several persons, ultimately advised, on the phone, consistent with what Plaintiff was told by the seller, that the DIAS, by itself, was not prohibited or subject to the registration requirements of the National Firearms Act, as long as Plaintiff did not own a compatible AR15 and M16 trigger parts, which Plaintiff did not possess, but that if Plaintiff were to acquire an AR15 or M16 parts, it was suggested that possession of both the auto sear and the AR15 and/or M16 parts might not be legal, if the group of items was not registered with ATF.

17. That the DIAS at issue in this case is/are not registered to the Plaintiff with the ATF, as when they were acquired, Plaintiff was repeatedly advised, as stated above, that by themselves, they were not required to be registered, unless coupled with an AR15 and M16 parts.

18. That the advice given by both the seller, and the local ATF office, in or about 1979, was legally correct, based on the official interpretation of the law at that time, in that, prior to November, 1981, the ATF, the agency responsible for administering the Federal National Firearms Act, which taxed and registered machineguns, did not consider a DIAS for an AR15, to be a machinegun, in and of itself, and as such, there was not, and never had been, up to that point, any need to, or for that matter, any ability to, register such an item with the ATF, in accordance with the National Firearms Act, or pay any kind of making or transfer tax on same.

19. That prior to November, 1981, DIAS, at least when not possessed with an AR15 rifle and certain M16 parts, were completely federally unregulated in any way.

20. That as this case is limited to items lawfully manufactured and lawfully possessed prior to November 1, 1981, a date that predates the enactment of 18 U.S.C. 922(o) by about five years, 19 U.S.C. 922(o) is inapplicable, as 18 U.S.C. 922(o) does not apply to any lawful transfer or lawful possession of a machinegun that was lawfully possessed before May 20, 1986, the date this 18 U.S.C. 922(o) took effect.[3]

21. That in 1993, well after the enactment of 18 U.S.C. 922(o), in May, 1986, the United States, and specifically, the ATF, agreed to register, in the National Firearms Registration and Transfer Record, several unregistered machineguns for former CIA Agent George Fassnacht, that he had acquired prior to 1968, and which were all manufactured, like the DIAS at issue in this case, prior to 1986.  (Ex. G).  On information and belief, Mr.

---

[3] That said pre-81 DIAS were both, by definition, legally possessed, prior to 1981, as they were then not so classified as machineguns, as well as after 1981 and prior to 1986, as per ATF Ruling 84-1, they were grandfathered and legal, per ATF ruling and guidance.  Under either view, they were lawfully possessed prior to May, 1986.

Fassnacht is now deceased, and his son inherited said firearms, electing to keep some and sell others.  On information and belief, all such firearms transferred under NFA procedures, with no restrictions, despite being registered in 1993 for the first time.

22. That, due to other events in life, and a lack of funds at the time, Plaintiff never acquired or sought to acquire any firearm or parts that the DIAS would work in or with, never applied to ATF to make a legal machinegun with the then unregulated DIAS, as was allowed under the law, and the DIAS simply sat, in a box, unused and forgotten, until recently.

23. That in about early 2020, a friend of Plaintiff advised Plaintiff that the friend had bought a new rifle, and wanted to know if Plaintiff wanted to go and shoot it.

24. This triggered a memory of the DIAS, acquired in 1979, and with nothing better to do, due to the COVID-19 shutdowns and lockdowns, Plaintiff went looking to see if he still had the DIAS.

25. That in early 2020, Plaintiff did indeed find his DIAS, in the same box he placed the DIAS in the late 1970s.  They were promptly put back into storage where they had been for decades, still unused.

26. At this point, and to this day, Plaintiff had not, and still does not own or possess any type of rifle which the DIAS could be installed, or any M16 machinegun parts.

27. That for personal reasons, Plaintiff decided that he wanted to legally sell and divest himself of the DIAS, and looked into the matter.

28. Upon investigation, Plaintiff learned that DIAS, if legal, have value on the open legal market, when legally transferred in accordance with the National Firearms Act of 1968,

by which it is understood to mean upon payment of $200 transfer tax, and registration in

the National Firearms Registration and Transfer Record,

29. On the other hand, unlawful machineguns, lack value and risks the possessor or transferor

substantial criminal penalties, which almost always include years in prison, substantial

fins and legally disabling felony conviction, which Plaintiff wishes to avoid.

30. That upon investigation, Plaintiff then contacted a licensed firearms dealer in the

Southern District of Illinois, and inquired as to (a) how to legally sell the auto sear, and

(b) whether the dealer wanted to buy it, or could refer Plaintiff to someone who might

want to lawfully buy them.

31. That it was quickly determined that it would be an utterly futile act, to try to file an ATF

Form 4, the form used to transfer NFA firearms, like machineguns, because the ATF

would summarily disapprove the Form 4, refund the $200.00 transfer tax, and refuse to

register the auto sear to the buyer, whoever it might be, as the auto sear is not registered,

just as ATF Ruling 81-4 says is not required, but which, as will be shown below, is not

clear, and appears to have morphed or changed, in official ATF guidance, over the years.

**CHANGE OF REGULATION AFTER BEING BOUGHT**

32. That although Congress passed no law changing the classification of a DIAS from

unregulated into a regulated item, and no notice of the reclassification was ever published

in the Federal Register, on or about November 1, 1981, the ATF issued ATF ruling 81-4,

which, reclassified AR15 auto sears as a "machinegun" in and of itself, whether

possessed with other parts, or a firearm, or installed in a firearm, or not.

33. Under ATF Ruling 81-4, for the first time, a DIAS was, in and of itself, a regulated item,

even if not possessed with any other items of any kind.

34. However, while ATF ruling 81-4 for the first time regulated a DIAS, it purported to, and, did, exclude existing DIAS from the reclassification, and stated,

> "With respect to the machine gun classification of the auto sear under the National Firearms Act, pursuant to 26 U.S.C. 7805(b), this ruling will not be applied to auto sears manufactured before November 1, 1981."

35. The reason that ATF grandfathered these auto sears, made prior to November 1, 1981, was that, as a practical matter, if it was going to regulate the items at all, it either *had* to grandfather the items and not regulate them at all, or alternatively, it had to declare an initial registration period, under the NFA, as allowed by Section 207(d) of the Gun Control Act of 1968, to allow registration of they then newly reclassified parts, or risk claims and arguments concerning *ex post facto,* regulatory takings, violation of due process and similar legal arguments.

36. That had ATF declared an initial registration period, or amnesty registration period, as was done in late 1968, it would have allowed possessors of the pre-1981 DIAS, to register the DIASs, which would have avoided the issues set forth in this lawsuit, something that, for political reasons, was unwanted by Defendant's office holding predecessors.

37. By simply grandfathering the pre-November 1981, DIAS, the ATF was, at least facially, was to allow the ATF to regulate new DIAS, going forward, but avoid arguments and claims concerning pre-1981 DIAS, as existing possessors of the pre-1981 DIAS were not actually affected by the ruling, and thus, would lack standing to make any legal claim concerning pre-81 DIAS.

38. In 1998, about 17 years after ATF Ruling 81-4, the U.S. Court of Appeals for the Seventh
Circuit, issued its decision in, *United States v. Cash*, 149 F.3d 706 (1998), which it stated,
in dicta:

> Read in conjunction with § 7805(b)(8), the proviso in the fourth paragraph
> of ATF Ruling 81-4 means only that the Secretary will not collect any tax
> under 26 U.S.C. §§ 5801, 5811, or 5821 on account of auto sears
> manufactured or transferred before November 1, 1981. The ruling does not
> — and cannot— excuse compliance with criminal laws applicable at the
> time of post-1981 transfers.

39. That *Cash,* went on, stating,

> "As in *Bradley* we move on without final resolution — for the
> prosecutor's acquiescence in defendants' legal position [that pre-81 auto
> sears are not regulated, by themselves, as opposed to with other M16 type
> parts] has deprived them of any reason to offer arguments supporting it.
> Perhaps their reading has some basis that we do not now perceive.
> Firearms dealers would do well to assume, however, that all current
> transfers of auto sears must comply with the statutes, no matter when the
> devices were manufactured.

40. That the dicta in *Cash*, while just that, *dicta*, and not controlling, it certainly raises a valid
question of whether the government can legally grandfather "machineguns", like it did in
rulings 81-4, 82-2 and 82-8, and if that is true, what is the legal status of persons that
possess these purportedly grandfathered items?

41. The U.S. government, in *U.S. v. Cash*, took the official position, in litigation, that pre-1981 DIAS, when not possessed or transferred in connection with compatible semi automatic rifles, and certain M16 parts, were still not regulated, in isolation, by federal law, pursuant to ATF Ruling 81-4, and thus, on this point *Cash* is expressly not controlling, though the Seventh Circuit Court of Appeals expressed doubt on the correctness of this point, which again, was the understanding of the actual litigants, including the government, in *Cash*.

42. That while the Appellate Court's statements are dicta, they also comprise a warning to persons who might in the future, fail to comply with a statute that, due to no fault of Plaintiff or people like Plaintiff, who possessed pre-81 DIAS, is actually impossible comply with, a point not dealt with or even apparently known to the Court in *Cash*, due to the official litigation position of both the government and defendant in that case.

43. The reason that it is impossible to actually comply with, is that (although as noted supra, See Ex. G, it has actually happened, in certain "special" cases), as of December, 1968, existing, unregistered NFA firearms, including DIAS, which are classified as machineguns, cannot be federally registered, except during a declared, "amnesty", after notice of which is published in the federal register. See *United States v. Freed*, 401 U.S. 601 (1971)("Congress amended the Act so that only a possessor who lawfully makes, manufactures, or imports firearms can and must register them.").

44. ATF officially interprets, and applies *Freed*, as holding in the National Firearms Act Handbook, Section 3.3 Status of unregistered firearms, that "Firearms not lawfully registered as required by the NFA may not be registered and legitimized by their possessors."

45. In fact, there is not even a current ATF form that Plaintiff could fill out to register an unregistered firearm.

46. Accordingly, if Plaintiff were to try to apply register or transfer his DIAS, it is an absolute certainty that the ATF would not allow the registration or transfer, rendering any such attempt absolutely futile.

47. However, the ATF has authority, under Section 207(d) of the Gun Control Act of 1968, Public Law 90-618, approved October 22, 1968, to establish amnesty periods, upon publication of notice in the federal register, of up to 90 days, to allow registration of unregistered firearms, which, if implanted, would solve the issue in this case.

48. That there has not been a declared "amnesty", or any other kind of open registration period for unregistered firearms since 1968, including at any time in or after 1981, in which Plaintiff could have registered the auto sear.  Thus, it has been mechanically impossible, due to lack of an actual process to do so, for Plaintiff to have registered his DIAS, at any time since he came into possession of it, or, for that matter, for anyone to have ever registered the DIAS, at any time since being manufactured.

49. That as the drop in auto sear was not regulated prior to 1981, prior to November 1, 1981, there was no need, or even ability, for the importer, manufacturer or maker to register the auto sear, prior to 1981.  It would literally have been like trying to register a rock or a shoelace as a machinegun.

50. In fact, had anyone tried to register a stand alone DIAS in the 1970s, under any existing mechanism under which a legal machinegun could have been lawfully made, manufactured or imported, and registered, said application would have been disapproved as the DIAS was totally unregulated at the time, as a stand along item.

51. That as of November, 1981, there was no ability of the possessor of a previously possessed (i.e. pre-81) auto sear to actually register such item, even assuming that the possessor was clairvoyant enough to predict, the legal and regulatory maginations, as descried in this lawsuit, and despite the plain language of ATF Ruling 81-4, and a whole host of similar ATF rulings, of that time, purporting to reclassify certain firearms as "machineguns", prospectively, and then grandfathering and exempting existing firearms from the reclassification.  See ATF Rulings 82-2 and 82-8, reclassifying certain "open bolt" semi automatics as machineguns, but purporting to grandfather and exempt an estimated 50,000 to 100,000 such guns, in the same manner that pre-81 auto sears were exempted in ATF Ruling 81-4, See also ORDER ATF 0 7540.1A, dated 10-29-1979, similarly exempting 1848 Belgian FN FAL machinegun receivers imported prior to that date)(Ex. H).

52. These "other" reclassified / grandfathered "machineguns" such as those described in ATF Rulings 82-2 and 82-8, and ATF order 07540.1A, remain as available on the open commercial market, with no attempt by ATF to seize them, or arrest or prosecute persons that possess or transfer same, and no footnotes in official publications concerning them, and no known letters from ATF stating or implying they are illegal to possess or transfer.

53. That in the official ATF Federal Firearms Reference Guide, as recently as the 2000 and 2005 Editions, show ATF Ruling 81-4 as being currently active, and, include an editor's note that

> "Regardless of the date of manufacture of a drop in auto sear, possession of such a sear and certain M-16 fire control parts is possession of a machinegun as defined by the NFA. Specifically, these parts are a

> combination of parts designed and intended for use in converting a
> weapon into a machinegun and are a machinegun as defined in the NFA.
> (See "Information Concerning AR15-Type Rifles" under "General
> Information" in this publication.)"

54. That said comments make clear that, as of 2000 and 2005, ATF officially, did not
regulate or treat pre-81 DIAS as machineguns, when not possess with certain M16 parts,
which is the same official position ATF and the U.S. Government had taken since 1981.

55. This was reaffirmed, as recently as 2009, in the still current official ATF National
Firearm Act Handbook, ATF E-Publication 5320.8, Revised: April 2009, located at
https://www.atf.gov/firearms/docs/guide/atf-national-firearms-act-handbook-atf-p-
53208/download (accessed 1-14-2021), in Appendix B, page 146, shows ATF ruling 81-4
as being currently valid, including the following language, which is consistent with the
original explanation of the ruling, but not the more recent explanation, as follows:

> "With respect to the machine gun classification of the auto sear under the
> National Firearms Act, pursuant to 26 U.S.C. 7805(b), this ruling will not be
> applied to auto sears manufactured before November 1, 1981. Accordingly, auto
> sears manufactured on or after November 1, 1981, will be subject to all of the
> provisions of the National Firearms Act and 27 C.F.R. Part 479.
>
> Editor's Note: Regardless of the date of manufacture of a drop in auto sear,
> possession of such a sear and certain M16 fire control parts is possession of a
> machine gun as defined by the NFA. Specifically, these parts are a combination of
> parts designed and intended for use in converting a weapon into a machine gun as
> defined in the NFA."

56. However, the official position of the ATF appears to have changed in or about 2014, when, for the first time known, ATF publicly changed its position, and changed the editors note in the official Federal Firearms Reference Guide, to state,

> "Regardless of the date of manufacture of a drop in auto sear (i.e., before or after November 1, 1981) the possession or transfer of an unregistered drop in auto sear (a machinegun as defined) is prohibited by the National Firearms Act (NFA), 26 U.S.C. § 5861, and the Gun Control Act, 18 U.S.C. § 922(o). The last paragraph of ATF Ruling 81-4 only exempts the making, transfer, and special (occupational) taxes imposed by the NFA with respect to the making, manufacture, or transfer of drop in auto sears prior to November 1, 1981. See 26 U.S.C. §§ 5801, 5811, 5821, 7805(b)(8)."

57. In addition, that in December, 2018, the ATF officially stated, publicly, that, in the context of bump stocks, that it recently reclassified as machineguns, that it claimed it lacked the legal authority to "grandfather" machineguns.  Federal Register / Vol. 83, No. 246 / Wednesday, December 26, 2018 / Rules and Regulations 66535.

58. In addition, further research indicated that, on December 17, 2018, in a letter on ATF letterhead, bearing symbols 907010:GSS 3311/309334 from Michael R. Curtis, Chief of Firearms Technology, Firearms Services Branch, to a manufacturer of firearms related tools, "[r]eguardless of the date of manufacture, of a DIAS, the possession or transfer of an unregistered DIAS (a machinegun as defined) is prohibited …"

59. These 2014 to 2018 writings are the first known times ATF and/or the DOJ changed their official positions, and stated, publicly, that it lacked the ability to grandfather

machineguns, contrary to what it purported to do in rulings 81-4, 82-2, 82-8 and ORDER ATF 0 7540.1A, and what it continues to do in rulings 82-2, 82-8 and ORDER ATF 0 7540.1A.

60. That the subtle change in official position, over time, is irreconcilable, and if the later position is upheld, will have deprived Plaintiff of all legal value of his property, without just compensation, as well as placed Plaintiff, a generally law abiding and peaceable citizen, into the position of committing a felony or several felonies, with no knowledge, intent or change in the factual *status quo*.

61. Despite the foregoing, neither ATF, nor DOJ, ever amended, withdrew, revoked or superseded ATF Ruling 81-4, or published a successor ruling, or any notice in the Federal Register that the grandfathering of pre-1981 DIASs had been withdrawn or revoked, or that prior advice publicly stated by Defendants was wrong or misleading, never provided any opportunity to register said items, and never offered an opportunity to pay just compensation.

## ADMINISTRATIVE PROCEDURE ACT REQUIREMENTS

**DEFENDANTS' VIOLATION OF APA REQUIREMENTS**

### A. APA Notice-and-Comment Requirements

56.     The APA applies to all executive branch agencies. 5 U.S.C. § 551(1). It prescribes procedures for agency actions such as rulemaking, as well as standards for judicial review of agency actions.

57.     Rulemaking is the "agency process for formulating, amending, or repealing a rule". 5 U.S.C. § 551(5).

58.     A rule is defined as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4).

59.     Under the APA, legislative rules are rules through which an "agency intends to create new law, rights or duties," *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc). They also include rules issued by an agency pursuant to statutory authority that implements a statute and where, in the absence of the rule, "there would not be an adequate legislative basis for enforcement action." *Wilson v. Lynch*, 835 F.3d 1083, 1099 (9th Cir. 2016) (citations omitted). In addition, a rule is legislative if it "repudiates or is irreconcilable with" a prior legislative rule or if it amends a legislative rule. Id.

60.     When an agency promulgates legislative rules, or rules made pursuant to congressionally delegated authority, the exercise of that authority is governed by the APA informal rulemaking procedures outlined in 5 U.S.C. § 553. 42. These procedures include notice-and-comment provisions in which federal agencies such as ATF must publish proposed rules in the Federal Register and provide the public with adequate notice of a proposed rule followed by a meaningful opportunity to comment on the rule's content through the submission of written "data, views, or arguments." 5 U.S.C. § 553 (b)–(c); see also *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1308 (D.C. Cir. 1991) ("[A]n agency can declare its understanding of what a statute requires without providing notice and comment, but an agency cannot go beyond the text of a statute and exercise its delegated powers without first providing adequate notice and comment.").

61.     Unless mandated by statute, there is no minimum period of time for which the agency is required to accept public comments. However, in reviewing agency rulemaking, courts focus on whether the agency provided an "adequate" opportunity to comment—of which the length of the comment period represents a factor for consideration. *Fla. Power & Light Co. v. U.S.*, 846 F.2d 765, 771 (D.C. Cir. 1988).

62.     Additionally, Executive Order 12866, which provides for presidential review of agency rulemaking via the Office of Management and Budget's Office of Information and Regulatory Affairs, states that the public's opportunity to comment, "in most cases should include a comment period of not less than 60 days." Exec. Order No. 12866, § 6(a), 58 Fed. Reg. 51735, 51740 (Oct. 4, 1993).

63.     After an agency considers public feedback and makes changes where appropriate, it then publishes a final rule in the Federal Register describing and responding to public comments, with a specific date for when the rule will become effective and enforceable.

64.     That ATF's, now repeated writings and statements, including in the 2014 version of the Federal Firearms Reference Guide, states new and different policy, official interpretation, and possible felony penalties, that did not exist from 1981 to and through, at least, 2005.

65.     Specifically, the 2014 and later publications and statements evidence a legislative rule that instituted a drastic change—a repudiation of the previous ATF rule on pre-81 DIAS, and that set forth new legal standards and new legal requirements based on unchanging conduct of the possessors and unchanging physical description and characteristics of the DIAS on "use." See, e.g., *Guedes v. Bureau of Alcohol, Tobacco*, 920 F.3d 1 (C.A.D.C. 2019) (ATF rule classifying bump-stock devices as "machineguns"

under NFA was legislative, rather than interpretive); *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016) (citing, e.g., *FTC v. Standard Oil Co*., 449 U.S. 232, 241 (1980) (APA's finality requirement is satisfied when a decision is a "definitive statement of the agency's position and had a direct and immediate effect on the day-to-day business" of the affected parties)).

## RESULTS OF THE FOREGOING

66. This left and leaves Plaintiff, with a conundrum affecting his day to day activities.

A:     On one hand, official Rule 81-4, officially still active and in effect, published repeatedly and recently by ATF, in official guides for the public to rely on, at least as published through 2013, says Plaintiff can legally continue to possess his DIAS, legally and without fear of prosecution, as long as Plaintiff and others do not also possess certain M16 fire control parts, but

B:     On the other hand, in and after 2014, ATF and/or DOJ stated, as least three times, despite not withdrawing, amending or superseding Ruling 81-4, that ATF cannot grandfather unregistered machineguns, suggesting that unregistered DIAS, regardless of date of manufacture, including those well prior to 1981, must be registered to be legal, and must be transferred in accordance with all provisions of the National Firearms Act.

66. At the same time, it has never been possible to actually register these pre-1981 DIAS, either before 1981, or after.

67. Thus, which is it, the foregoing positions of the U.S. Government, is and has been logically and legally inconsistent and impossible to reconcile, and under the original interpretation classifies Plaintiff's conduct as legal, and under the more recent

interpretation, classifies the exact same conduct as felonious, despite no change in conduct by Plaintiff.  Literally, Plaintiff went to sleep one night, being clearly law abiding, and woke up the next day, possibly committing a felony.

## MATTERS NEEDING ADJUDICATION

68. That Plaintiff, wishing to conduct himself in accordance with the law, and to fully exercise his rights under the law, seeks and requires answers to the following questions:

    A.  Is Plaintiff able to lawfully continue to possess his PRE-1981 acquired DIAS, despite same not being registered with the ATF?

    B.  Is Plaintiff able to lawfully transfer his PRE-1981 acquired DIAS to a transferee, without application to transfer and register a firearm, on ATF Form 4, and payment of a $200.00 tax?

    C.  Would the possession of the DIAS, by transferee, after transfer as described in subparagraph B above, be lawful?

    D.  Is Plaintiff required to *register* with the ATF, his DIAS, lawfully possessed prior to 1981, in order to lawfully possess same in the future, and if so, mechanically how is he to do so?

    E.  If Plaintiff is only able to transfer his pre-1981 acquired DIAS to a transferee, with an application to transfer and register a firearm, on ATF form 4, with payment of $200.00 tax, is ATF required to approve that application, to an otherwise eligible transferee, despite the DIAS not being presently registered.

    F.  Does the ATF have the legal authority to grandfather machineguns, including the future possession and transfer of same without NFA registration and tax

imposed in future transfers, under the National Firearms Act, when a given

item or firearm is reclassified from some other category into that of a

machinegun, such as in the rulings and order cited in this complaint?

G. If the ATF lacks said authority to grandfather reclassified machineguns, is the

ATF required, as a matter of due process, required to either allow a reasonable

initial registration period for the reclassified items?

H.  Does the ATF and/or the DOJ, have authority, under the Gun Control Act, to

declare and hold the establishment of one or more amnesty periods not

exceeding 90 days per period, and if so, would this authority include pre-81

DIAS?

I. If the ATF does not hold an initial registration period for pre81 DIAS, is the

National Firearms Act's transfer tax and registration requirements

constitutional, as applied to pre 81 DIAS?

## REQUESTED RELIEF

69. In either event, Plaintiff, as a lifelong law abiding citizen, wishes to comply with the

law, in all aspects, wishes to pay all taxes actually due to the federal government, and

wishes the federal government to actually accept payment of those taxes, wishes to

register all firearms required to be so registered and wishes to avoid being subject to

criminal and/or civil penalties and/or sanctions, and in light of the substantial criminal

penalties if Plaintiff is wrong in his interpretation, or in picking which of the

competing interpretations.  Plaintiff requires court resolution.

70. Plaintiff requires court resolution, as there is conflicting information, and conflicting

and changing official interpretations made with compliance with the Administrative

Procedure Act, as shown above, on what is legal, and what Plaintiff must do to act

legally and remain legal in the future.

71. That this court has subject matter jurisdiction pursuant to 28 U.S.C. 1331 (federal

question jurisdiction) and the Federal Declaratory Judgement Act, which states as

follows:

> "In a case of actual controversy within its jurisdiction, . . . any court of the
> United States, upon the filing of an appropriate pleading, may declare the
> rights and other legal relations of any interested party seeking such
> declaration, whether or not further relief is or could be sought. Any such
> declaration shall have the force and effect of a final judgment or decree
> and shall be reviewable as such."

28 U.S.C. § 2201(a).

72. Plaintiff simply seeks declaration of his rights, whatever they are, to guide his future

actions, those of Defendants and to determine, for all interested parties, what the law

actually is, and for all parties to comply with same.

WHEREFORE, Plaintiff John Roe, humbly requests that this Honorable Court rule, decree

and declare, and enter appropriate preliminary and permanent injunctions consistent with its

findings, as to:

A. Is Plaintiff able to lawfully continue to possess his PRE-1981 acquired DIAS,

despite same not being registered with the ATF, without violation the National

Firearms Act of 1968?

B.  Is Plaintiff able to lawfully transfer his PRE-1981 acquired DIAS to a transferee, without application to transfer and register a firearm, on ATF Form 4, and payment of a $200.00 tax?

C.  Would the possession of the DIAS, by transferee, after transfer as described in subparagraph B above, not violate the National Firearms Act, or any other federal law.

D.  Is Plaintiff required to *register* with the ATF, his DIAS, lawfully possessed prior to 1981, in order to lawfully possess same in the future, and if so, mechanically how is he to do so?

E.  If Plaintiff is only able to transfer his pre-1981 acquired DIAS to a transferee, with an application to transfer and register a firearm, on ATF form 4, with payment of $200.00 tax, is ATF required to approve that application, to an otherwise eligible transferee, despite the DIAS not being presently registered.

F.  Does the ATF have the legal authority to grandfather machineguns, including the future possession and transfer of same without NFA registration and tax imposed in future transfers, under the National Firearms Act, when a given item or firearm is reclassified from some other category into that of a machinegun, such as in the rulings and order cited in this complaint?

G.  If the ATF lacks said authority to grandfather reclassified machineguns, is the ATF required, as a matter of due process, required to either allow a reasonable initial registration period for the reclassified items?

H.   Does the ATF and/or the DOJ, have authority, under the Gun Control Act, to declare and hold the establishment of one or more amnesty periods not

exceeding 90 days per period, and if so, would this authority include pre-81 DIAS?

I.   If the ATF does not hold an initial registration period for pre81 DIAS, is the National Firearms Act's transfer tax and registration requirements constitutional, as applied to pre 81 DIAS?

, plus an award of costs and attorney fees, under the Equal Access to Justice Act, and such other, further and different relief, such that full adjudication and determination of the relative rights and responsibilities of the parties is determined and adjudicated, and that Plaintiff can receive an authoritative determination of the law, and conduct his activities in accordance therewith.

Dated:  February 3, 2021                          Respectfully Submitted,
                                                  John Roe,


                                                  By:s/Thomas G. Maag

                                                  Thomas G. Maag
                                                  Maag Law Firm, LLC
                                                  22 West Lorena Avenue
                                                  Wood River, IL  62095
                                                  Phone:  618-216-5291
                                                  tmaag@maaglaw.com